1. The court misconstrued the powers and jurisdiction of the parish court, in supposing it to be a court of inferior and limited jurisdiction, in comparison with the district courts in civil matters.
2. The court erred in the interpretation of the contract, on which the suit was grounded, in supposing it to be local, at Nashville, and there to be performed : and also, in supposing it to be a condition on which the payment, or non payment depends, that the notice of protest and demand of the money at Nashville, was necessary to be made, previous to the right of action accruing to the plaintiffs, as holders of the bill.
3. They misconstrued the law of attachment of the state, which makes the property of the debtor, in this parish, to represent the debtor, when he permanently resides abroad.
For by the contract, the debt became due at New-Orleans, and not elsewhere, and on the non-payment of it by the principal debtors, the acceptors of the bill, the obligation of the indorser, to pay it, became eo instanti absolute, and had he been present, there could have been *70 no doubt he might instantly have been sued either in the district or parish court, at the option of the plaintiffs. But being absent, he was represented by his property, under our laws of attachment, and in this manner suable in either court.
I. By the constitution of this state, the judiciary power is vested in a supreme court, and inferior courts. By law, the parish court of New-Orleans is placed in the same grade of inferior courts, as the district courts in civil matters. There is, I conceive, no sort of difference in the cases, nor in the amount, cognizable by the one and by the other. But, in cases of doubt, it is consonant with the soundest rules of law and equity, and becomes the duty of a good judge rather to enlarge his jurisdiction in favour of justice, than to restrict it, and in all such cases to entertain the cause ; the maxim in equity is, Boni judicis est ampliare justitiam, so it is in law, ampliare jurisdictionem. It surely does not form any part of the duty of a court, in the construction of statutes, to listen and give ear to far fetched and high strained niceties, which tend to defeat the justice of the case; and besides, when the practice under the law, for a succession of years, has established a *71 certain course of proceeding, although a different practice may in strictness be more correct, that course will not be overthrown, unless some important good will be promoted by the change ; it is better to let the law remain as it has been practised, than by a decision of the court, to undo what has been settled and fixed ; and leave the matter to legislative wisdom.
I must be excused, for again urging the opinion, that there is no difference in fact, nor in principle between the powers of the parish court and those of the district court ; and surely it ill suits the gravity of the supreme court of the state, to offer, as a reason for their opinion, that the powers intended by the legislature, to be given to the one court, are different from those given to the other, because, the translation of the English text into French, is different in words. The English is the law ; it is by constitutional order ; the translation of that law is, at most, but the opinion of some clerk of the house, that it should be expressed in French, in such and such words. Will the court adopt the words of a clerk of the house, against the justice of the cause, rather than follow the plain and necessary meaning of the legislature, in the only part that, by the constitution, can be received as law ? Certainly this would be to offer *72 an excuse, rather than to give a just reason for the opinion ; but if the translation of the law into another language is to govern, then let us take the authority of the dictionary for the meaning of the word " originating,” and by it we shall find, the translator has made a figurative expression, instead of the literal sense : prendront naissance, is no translation of the English participle " originating.” But I dismiss this part of the subject, with this single remark, that the French is not the law, but only a translation, which may or may not be correct.
I think on a review of that part of the opinion of the court, which relates to the powers of the district courts, it will be deemed erroneous. The opinion asserts that the 4th section only gives power to try the cases arising in the parish, but does not confer the jurisdiction ; but that the jurisdiction is confered by the § 16. This section directs the mode of proceeding ; and surely there is a distinction between the mode of proceeding, to enforce a right cognizable before a court, and the right to take cognizance and to entertain jurisdiction of the cause, or subject matter of the court. But the law is misquoted, or rather it is quoted only in part ; and if quoted in the whole, the sense is not *73 such as that set forth in the opinion. The § 16th, declares “ that the proceedings of the said district courts in civil, as well as in criminal cases, shall be governed by the acts of the territorial legislature, regulating the proceedings of the late superior court of the territory of New-Orleans : and that they shall have the same powers, when not inconsistent with this act, which were granted to the said superior court by the said acts.”
Now, if this section confers a general jurisdiction to the district courts, over all cases wherever they may have arisen, or wherever they may have originated, or whether they are of a civil or criminal nature, and is to controul the plain and necessary meaning of words of the § 4th, which declares in totidem verbis, " that there shall be a court in each parish, (except in the first district) to be held for the trial of all civil cases, which may arise in said parish ;" and for those parishes composing the first district, the court shall be held at New-Orleans ; for the like purpose, then this provision was necessary ; and so was that contained in the 15th section, couched in these words : “the district courts shall have criminal jurisdiction in all cases whatsoever.”
It seems to me a clear and undeniable rule of *74 construction, that the particular provisions of a law are not to be controuled by general words to the contrary ; and in the different parts of this law, we find the legislature giving special powers and confering special jurisdiction to the district courts, to wit, in the § 4, they have power given to try all civil cases arising in the parish, or if we speak of the first district, we should say " to try all civil cases arising in the district ;” § 15, they have conferred “ criminal jurisdiction in all cases whatsoever.”
But, I look in vain into the acts of the territorial legislature, regulating the proceedings of the late superior court, for any grant of jurisdiction ; I can find only some regulations for the proceedings of causes therein ; unless indeed we are to understand the § 22, of the act of 1805, as conferring jurisdiction ; but I fancy no lawyer would consider that section as having any other intent, than to say that the courts should have power to issue certain writs know to the common law, such as quo warranto, procedendo, mandamus and prohibition, and to declare that when issued, they shall be in the form, and that the modes of proceeding thereon, shall be according to the common law.
But what have these writs to do with cases originally cognizable before that court, such as *75 actions of debt, damages for injuries to persons or property, for real actions, &c. &c ?
The truth is, there is not in any of the territorial laws regulating the proceedings of the superior courts, any grant of jurisdiction in such cases ; they are as they purport to be only laws, regulating the mode of proceedings therein. Their powers were derived from the acts of congress.
With what propriety, therefore, does the opinion rest on those laws, as the basis on which the district courts found their jurisdiction of civil cases which neither originate, nor arise in the parish or district, and when none of the parties reside there ? This is a question which I am unable to solve, and must, therefore, beg leave to ask of the court a solution. I ask it, because upon it depends this important principle, that unless there are some powers implied, or hidden, which the district courts derive from the territorial laws, which enable them to have and take jurisdiction of civil cases arising abroad, to wit, out of the parish and district, they must either not have those powers, or they must derive them from the general principles of jurisprudence, which declare certain personal actions to be transitory, and suable upon, wherever the defendant or his property may be found.
*76 If this general principle is admitted as necessary, to enable the district courts to take cognizance of cases arising abroad, then I contend the principle is regularly applicable to cases suable in the parish court ; no difference, in principle or in reason, is perceived to exist. If one court may take cognizance of the case, so may the other, and if the one cannot, so likewise cannot the other. This is a consequence inevitable, and upon it, have the courts ever acted since they were organised.
But if it is fair to couple the 4th and 16th sections of the district court law, to understand why they have jurisdiction of cases arising out of the district, so I think upon a parity of reason, is it fair to couple the 1st and 2d sections of the parish court law, for by the first section, this court has concurrent jurisdiction in civil cases, and by the second section, the mode of proceedings, before it, shall be in all respects similar to that prescribed for the district courts, and by the fourth section, the judge is empowered to fulfil the same functions in every other respect, as were assigned to the judge of the city court, under the territorial government.
The jurisdiction of the county courts extended to all causes of the value of 50 dollars, and upwards, which shall arise on contract, where *77 the debtor resides, or is found in the county, and the city court had the same jurisdiction, as the county courts ; no one, I think, can reasonably doubt, that the city court had a general jurisdiction of civil causes, arising on contracts ; notwithstanding the judge’s salary was to be paid out of the like fund, as that of the present parish judge. But indeed, it is the first time I have ever heard, that the extent of jurisdiction was to be measured by the amount of salary, or limited by the fund, out of which it was payable. Surely there was a mistake in the mode of proceeding, when the salary of the judge was resorted to, as affording a reason for considering, that his jurisdiction extended only to contracts made in the parish. But, if there is any force in that argument, as relative to the parish court, it must apply with a great force to the district courts, and restrict them, if not to contracts made in their district, to those made within the state. But the truth is, there is nothing in the argument ; for citizens of other states resort to our courts for attachments, against foreigners, as well as our own citizens. But, we have seen that the parish judge is to fulfil all the functions of the city judge, under the old system. Now, in the seventh section of the county court law, we find, inter alia, this duty pre *78 scribed, “ that whenever a petition shall be presented for the recovery of a debt due from a person residing out of the territory, and such residence abroad, together with the existence of the debt, shall be proved to the satisfaction of the judge, he shall direct the clerk to issue an attachment, &c.”
This was one of the functions of the city judge, prescribed by the territorial law, which, by the parish court law, is assigned to the parish judge, and fits our case, as expressly as if made on purpose for it.
We have likewise seen, that by the second section of the parish court law, the mode of proceeding, before that court, shall be in all respects, similar to that prescribed to the district courts.
In the district court law, and in that very sixteenth section, which the supreme court think gives a general jurisdiction, we are referred to the territorial laws regulating “ proceedings in civil causes.”
By the eleventh section of that law (1805) we have the identical same words of the county court law just quoted, viz. “That whenever a petition shall be presented for the recovery of a debt due from a person residing out of the territory, and such residence out of the territory, *79 together with the existence of the debt demanded, in such petition, shall be proved to the court, if in session, or to some judge thereof, in vacation, then such court or judge, shall order the clerk to issue an attachment, &c.” Here is the mode of proceeding, and the duty of the court as well as its power, all coupled together : and whether we take the functions of the judge of the city court, or the rules of proceeding as prescribed for district courts, for our guide in this case, we shall come to the same conclusion, to wit, that the judge was not only authorised, but bound, to order the attachment prayed for in this. And, with every submission to the superior intelligence of the supreme court, I must be permitted to say, that in my opinion, this mode of reasoning, brings no “ absurd conclusion.”
But if all this reasoning is of no avail, and the court should still be of opinion that no case is cognizable in the parish court, but such as depend on contracts made in the parish, it would be useless to consider farther, what may be urged under the other heads. But as it is by no means clear, that the court is restricted to such cases, I proceed to examine the second point.
*80 II. The law of bills of exchange has grown out of commercial usage, for there are no statutes on the subject, but such as are made to give them greater credit, and to extend the rights, as well as the more effectually to secure the holders of them.
We must, therefore, consult the writers on this particular branch of the law, for an accurate understanding of the true principles on which the rights of the holder depends, as well as the obligations of the drawer, acceptor and endorsers, towards him.
It is laid down in Buller’s Nisi Prius, 269, that if a bill is presented for acceptance, and it is refused, that an action may be immediately commenced against the drawer, without waiting for the expiration of the days of sight. The same law is laid down in Douglas, 55.
In 2 Strange, 949, it was contended that no cause of action existed against the drawer, until after non-acceptance and protest ; but the court decided that the drawing of the bill was the time of contracting the obligation. This decision was made in favour of a bankrupt, and he was discharged on that principle.
In 3 Wilson, 17, the court held the obligation of the drawer to be debitum in presenti, solvendum in futuro, and that a protest is nothing *81 but a notice that the drawee will not pay it, and creates no new obligation on the drawer.
The same law is laid down in Evans’ Essay on bills, 38, 9.
In Chitty’s Law of Bills, a work in which all the modern decisions are collected, and the principles, by which the rights and obligations of all the parties are governed, are considered, and clearly laid down, we find in p. 121, 122, this doctrine further enforced ; he says, upon the delivery of the bill to the payee, the liability of the drawer, immediately becomes complete. The act of drawing the bill implies an undertaking to the payee, and to every subsequent holder, that the bill will be duly honored. On failure of this engagement, the drawer of the bill will be immediately liable to an action.
I have brought this part of the law, relating to the drawer, as fully before the court, for the purpose of showing that the obligation to pay, does not depend on the contingency of notice and demand ; but is complete, the instant the bill is dishonored. But he may be discharged from that obligation , by the neglect of the holder , as I shall presently show.
But although the obligation of the drawer is contracted, when he delivers the bill, it does *82 not follow, that he is not answerable, on that contract, at any other place than that were he made the bill ; for it is well known that he may make the performance of it to be at any other place ; and the contract shall be governed by the law of the country, where it is intended to be performed. Dallas’ Rep. Bay's Rep. and many others.
But, as our case is that of an endorsee, on the endorser, in consequence of the dishonor of the bill, by the drawer, it is incumbent on me to show that the obligations of the endorser, to the endorsee, are precisely the same, as those of the drawer of the bill.
Chitty, 154, 5, treating of the effect of the endorsement, and transfer of bills, says the nature of a transfer of a bill, the right which it verts in the assignee, and the obligation which it imposes on the person making it, will appear from what he had already said of the time, person, and mode of tranfer. He then adds “ a transfer of a bill of exchange, by endorsement, it is said, is equivalent in its effect to the drawing of a bill ; the endorser being considered as a new drawer, on the original drawer. And if the drawee refuses to accept, the endorser is immediately liable to be sued.”
In 3 East, Ld. Ellenborough says “there *83 is no distinguishing the case of an endorser, from that of the drawer : it having been long ago decided, that every endorser is in the nature of a new drawer, every endorsement as a new bill, and that the endorser stands, as to his endorsee, in the law merchant, the same as the drawer. And in a late case tried before him at Guildhall, it appeared to be the universally received law merchant on the continent, that an endorser was liable immediately on the nonacceptance of the drawee.
That the law of bills is as I have laid down, I am confident, the court will find on an re-examination of the subject.
What, therefore, must have been my surprise, at finding the law laid down by the court in these terms, " an endorser undertakes that if the drawee cannot be found at the place mentioned, or refuses to honor the bill, and the endorsee after fulfilling all the formalities which the law requires, gives timely notice to the endorser, he will pay, &c."?
Is it possible the court could seriously be of opinion, that the endorser is not liable, until after the endorsee gives him timely notice of the dishonor of the bill ? I cannot be mitaken in the plain meaning of the words, such is their meaning ; and that idea is made more manifest, *84 by the next two or three sentences, wherein it is said “ the endorsement is a conditional promise.” Very true, it is as much conditional, as the contract of guaranty, or surety. But on what contingency does that condition depend ? The opinion informs us it depended on “ the notice of non-payment being sent to Nashville, the place where the endorsement was made, and on the receipt of that notice, by the defendant ;” “ he is (says the opinion) then bound to pay, and was suable instantly, and on the spot,” and that too, “ in the corporation court of Nashville, if there be such a one with a limited jurisdiction ;" for the cause of action, it is said, did arise in that town.
This part of the opinion is so contrary to the principles of the law of hills of exchange, as known and practized in the United States, that unless there is some other law to govern the case, and more is quoted by the court, I am bound to believe the court will find on a review, that the principles, on which it is founded, are mistaken, and the assumption of these erroneous principles has necessarily led the court into an erroneous decision.
So far from the right of action depending, on the circumstance of the defendant’s having received, at Nashville, a notice of the dishonor of *85 the bill ; I am warranted in saying he was liable to the action of the plaintiff, although, he never did receive notice of the dishonor ; this I shall show by repeated decisions on that very point.
The holder may lose his right by his own neglect ; the obligations of the endorser may be discharged by the misconduct, or neglect of the holder ; as if he does not apply to the drawee at the proper place, or in proper time, for acceptance, or payment after acceptance ; or if he neglect to send notice of the dishonor, within a reasonable time, and a loss is thereby occasioned to the endorser, or drawer. Chitty on Bills. 213.
But there are many cases where notice will be dispensed with, and yet the obligation of the drawer and endorser be continued ; some of these cases being mentioned, will show that the action of the holder existed before, and that it does not accrue to him, after the receipt, of notice, but upon the dishonor of the bill. If his rights did not then exist, he could not lose them by neglect ; a creditor on a bond may lose his action by delay.
The bankruptcy of the drawee will dispense with notice to the drawer. No funds of the drawer, in the hands of the draw *86 ee, will dispense with notice. Bankruptcy of the drawer will dispense with notice to an endorser. Chitty on Bills, 225, 6, 7, and the cases there cited.
But there are other causes, which will excuse the want of notice. As the absconding of the drawer, or endorser. The sudden illness of the holder, or of his agent, or other accidents. Chitty, id.
I now proceed to shew, that the obligation of the drawer and indorser may continue, and the action of the holder may exist, although notice of the dishonor of the bill was not received by them, or either of them.
The holder is only held to the use of due diligence, to obtain payment of the drawee ; and in case of non-acceptance or payment, to give notice thereof in reasonable time.
The sending of a letter by the ordinary mode of conveyance although it miscarry, or does not arrive until a long time after, is sufficient. Sending a letter by a ship from India, to London ; or by a ship from America, to Europe ; or by the ordinary post, although it miscarry will be deemed diligence. The holder is not bound to deliver the notice, he is only requested to send it by the ordinary mode of conveyance. *87 Chitty, 235, and 236, and the cases cited. Lanusse vs. Massicot, & al. 3 Martin, 267, 8.
By what has been shown, I think it plainly appears the plaintiffs’ right of action accrued to them, the instant the bill was protested for nonpayment, at New-Orleans, that their right of action was neither suspended, nor postponed, until after notice was received by the defendant ; and for the first time, it was then brought to life. It had existence at the city of New-Orleans, the enstant of protest : the contingency, on which the conditional promise of the endorser became absolute, was then accomplished, and their rights to sue then originated, then it had legal birth in this city.
Will it be contended, that because the hill bears date at Nashville, that the contract was there to be performed ? I think it cannot, even, be so pretended. Was there any thing local in the transaction at Nashville ? I think not.
The bill is payable at New-Orleans, the acceptors have contracted to pay here, the endorser contracted with us, that we should here receive our payment, he guaranteed that payment here, he failed in his contract. And where did the right to sue him first accrue to the plaintiffs ? Why, most assuredly at New-Orleahs. Their action originated there.
*88 This interpretation of the case, is particularly necessary where the drawer and indorsers are out of this state ; for if it were otherwise, the holder of a bill of exchange would be in a worse condition, than other creditors. A single example will shew this to be the case.
Suppose A, a resident in London, draw a bill in favour of B, a citizen of New-Orleans, on C, likewise a citizen of New-Orleans, and when this bill is dishonored, the drawer has in New-Orleans property sufficient to pay this bill, if attached ; shall the holder be told he has no action in this bill, until after he has given a notice to the drawer in London, and demanded the payment there? If this was the case, the defendant’s property in the mean time, might be removed ; and the holder, though a citizen of New-Orleans, would be compelled to resort to the court of England for a remedy.
Such a construction I believe was never given to a case so circumstanced. And indeed it would prove of mischievous consequence, and defeat in a great measure the remedy by attachment.
III. On this point, I shall find it unnecessary to dwell, nor to be prolix. Most of what I had to offer on it, has been embraced in considering *89 the matter which fell under consideration in the two former heads of the subject.
It will be remembered that, by the second section of the parish court law, the proceedings before that court, shall be in all respects similar to those prescribed for the district court.
The power to issue attachments against the property of a debtor, who resides out of the state, and mode of proceedings thereon, is found as well in the old county court law, as in the superior court law.
This attachment law is in reality nothing more than a law, prescribing the mode of proceeding against absent debtors ; and is not only borrowed from the like law of the other states in the union, who borrowed it from the customary law of London ; but like that customary law is general, and has no reference to the place where the contract was made, nor where the action originated, but has reference only to the place where the debtor’s property is found. Three things only are requisite to authorize the court to pursue that mode of proceeding in favor of the plaintiff : 1st. the existence of the debt ; 2d, the absence of the debtor, and 3d, the property of the debtor, in the jurisdiction of the court.
*90 The words of our act of assembly have no kind of limitation, they are, “ that whenever a petition shall be presented for the recovery of a debt due, from a person residing out of the territory, &c.” No matter where the debt was created, the attachment is the mode of proceeding prescribed ; such too was the effect given to the mode of proceeding in London.
The court of Hustings in London had jurisdiction of all pleas real, personal and mixed within the city.
But although, the jurisdiction of that court was limited, to cases arising within the city, yet in foreign attachments, no attention was paid to the domicile of the defendant, nor to the place of contracting the debt ; let the debt arise where it will, it is attachable. Sargent, Law of att. 7, 8.
Rehearing not Granted.